UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MARK E. RALEIGH,** | 2:18-CV-11591-TGB-DRG |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **SERVICE EMPLOYEES INTERNATIONAL UNION,** | |
| Defendant. | |

Mark Raleigh worked for the Service Employees International Union ("SEIU") as a union organizer for close to eighteen years. In the late fall of 2017, when he was a Deputy Campaign Director, Raleigh took leave under the protections of the Family and Medical Leave Act ("FMLA") to deal with stress and anxiety related to his work. At this same time, the SEIU was investigating allegations of nepotism and sexual harassment among its employees. As a part of this investigation, SEIU asserts it learned about Raleigh's supervising a no-show employee and engaging in abusive behavior towards other employees; his employment was subsequently terminated. As Plaintiff in this lawsuit, Raleigh has filed a Third Amended Complaint ("TAC") contending that

1

the Defendant SEIU's conduct towards him, and its decision to terminate him, was in violation of the FMLA. He also claims that the SEIU publicized information about his employment status in a way that defamed him by stating he had been sexually harassing employees, when that was not the case. Defendants have filed a Motion for Summary Judgment on these claims.

For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

## I.    BACKGROUND

A detailed factual background of this case may be found in the Court's previous Order addressing Defendant's motion to dismiss. ECF No. 18, PageID.208-210. In summary, in October 2017 SEIU executive Scott Courtney was discovered to be in a romantic relationship with an employee who reported to him. This led to an internal investigation, during which it came to light that one of Courtney's relatives appeared to be a "no-show" employee, and Plaintiff Raleigh was their supervisor.

Three things happened next, all on October 23, 2017. First, SEIU executives decided to place Raleigh on administrative leave to further investigate the allegations. Second, Raleigh emailed his supervisor a doctor's slip stating that he would "totally incapacitated" for a week due to mental health reasons, after which he failed to respond to numerous phone and email communications from SEIU staff attempting to reach him. Third, Scott Courtney resigned.

2

In the wake of this resignation, the SEIU sent an organization-wide communication indicating that any employees with concerns about any supervisors should bring them forward. Over the course of the next week, three different SEIU employees reached out to SEIU leadership to express concerns about Mark Raleigh's conduct during the time he had been their supervisor. Unlike Mr. Courtney, these allegations did not concern inappropriate workplace relationships or sexual harassment, but rather pertained to "abusive behavior and threats." Meanwhile, on October 26, Raleigh submitted another doctor's slip extending the time of his claimed incapacity to November 7. TAC ¶ 14, *see also* ECF No. 41-8. SEIU executives tried to reach out to Raleigh to get his side of the story regarding the employees' reports. He did not respond, believing—he now says—that because he was taking medical leave as allowed under the FMLA, he had no duty to engage with work-related communications. The SEIU terminated Raleigh's employment on November 2, 2017. TAC ¶ 21.

Throughout this time period, the SEIU was issuing internal communications, as well as external press releases, regarding the investigation. Although none of the external press releases mentioned Raleigh's name, several popular media and news outlets reported that he had been placed on administrative leave for sexual harassment-related allegations. No SEIU employee issued any public statement correcting the inaccurate reports that Mark Raleigh had been suspended due to sexual harassment charges and clarifying that he was in fact being

investigated because of allegations regarding his workplace demeanor and potential nepotism.

Plaintiff now alleges that the SEIU acted in violation of the FMLA, in part because he had asked for leave and was terminated during the period when he was on leave. He also alleges various tort claims stemming from the SEIU's communication of its decisions, both internally and publicly, during this series of events.

Defendants filed a Motion for Summary Judgment on January 29, 2021 (ECF Nos. 40, 41), which was fully briefed as of April 14, 2021. The Court heard oral argument on August 25, 2021.

## II.   STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

### III.   ANALYSIS

#### A. FMLA violation

Plaintiff argues that his FMLA rights were violated under both interference (or entitlement) and retaliation theories.[1]

---

[1] Plaintiff also argues he was not properly provided notice of his FMLA rights, which is generally construed as an interference claim. ECF No.

### i.    Factual background

The following timeline of events[2] in 2017 is relevant to the analysis of Plaintiff's FMLA claims:

- October 16: Scott Courtney is suspended. ¶ 5.

- October 18: An email is sent to all SEIU staff indicating that there was an internal investigation ongoing and that anyone with concerns should reach out to SEIU leadership. ¶ 5.

- October 20: SEIU General Counsel Nicole Berner speaks to Plaintiff about one of Scott Courtney's relatives, who appeared to be a "no-show" employee on the payroll in Detroit. ¶ 7.

- October 22: Three SEIU executives decide to put Plaintiff on administrative leave, allegedly to further investigate the possible no-show employee relative of Scott Courtney. Frane Dep. 60:8-17, 63:12-23, ECF No. 51. One of the executives drafts a notice to be

---

43, PageID.881. However, he has not raised a genuine issue of material fact as to whether he was prejudiced at all by this failure—he was fully paid up until he was terminated, and no one tried to misrepresent his FMLA rights or offer less than the required amount of leave. Without a showing of prejudice, he cannot recover, making summary judgment appropriate on such a claim. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (finding that "§ 2617 provides no relief unless the employee has been prejudiced by the violation").

[2] All citations unless otherwise stated are to Defendant's Statement of Material Facts, ECF No. 40, and have been cross-checked against Plaintiff's Statement of Material Facts, ECF No. 43.

sent the next day, after SEIU leadership speak with Plaintiff by phone. ¶¶ 8-9; *see also* Emails from 10/22, ECF No. 40-7.

- October 23:

  - Plaintiff emails his supervisor at 5:46 AM saying that he was going to be at the dentist. His supervisor responds with her approval. ECF No. 40-9.

  - SEIU Deputy Organizing Director Dalinda Fermin, unaware of the doctor's slip or dentist appointment, attempts to contact Plaintiff by phone. ¶ 10.

  - Presumably in response to her phone call, Plaintiff forwards his supervisor's approval to Fermin at 8:41 AM. ¶ 10 n. 3.

  - Fermin sends an email at 8:46 AM asking Plaintiff to call her. ¶ 10.

  - Plaintiff does not call back. ¶ 11.

  - Sometime in the morning, Scott Courtney resigns. *See* ECF No. 40-15.

  - At 9:16 AM, SEIU President Mary Kay Henry sends an email to all SEIU staff that Courtney's resignation was based on an internal investigation. ¶ 16. This email also indicated that a staff member was to be placed on administrative leave. ¶ 17.

  - Plaintiff emails his supervisor at 10:33 AM with a doctor's slip saying he would be "totally incapacitated' from October 23 to October 30. ¶ 10 n. 3, ¶ 13; *see also* ECF No. 40-13.

7

- o At 11:35 AM, SEIU HR Director Leslie Edmond sends an email with the administrative leave notice. ¶ 12.

- o At 11:37 AM, Plaintiff's supervisor forwards the email with the doctor's slip to Fermin, who then forwards it to Edmond at 11:38 AM. ¶ 13.

- o Sometime after the morning's all-staff email, SEIU executives including Henry, Frane, and Rosenthal host at least two internal conference calls for SEIU staff regarding the day's events. *See* Fells Dep. 31:5-23, ECF No. 43-3, PageID.932.

- Sometime during the week of Oct 23, General Counsel Berner has two conversations with employees who allegedly report concerns about Raleigh's "abusive behavior and threats" towards them when he was their supervisor. ¶¶ 20-21; *see also* ECF No. 44-8, PageID.1527. SEIU Executive Vice President Leslie Frane has a similar conversation with a third employee. ¶ 22; *see also* Frane Dep., ECF No. 51, PageID.2243.

- October 26: Plaintiff submits another doctor's slip extending the time of incapacity to November 7. ¶ 14; *see also* ECF No. 41-8.

- November 1: SEIU National Organizing Director Barbara Rosenthal calls Plaintiff to let him know that SEIU Chief of Staff Deedee Fitzpatrick wants to speak with him. ¶ 24. Fitzpatrick sends Plaintiff an email asking to set up a time to speak. ¶ 24. Plaintiff does not respond.

8

- November 2: Fitzpatrick sends an email stating that if Plaintiff does not contact her by 10 AM, SEIU executives would move forward with the investigation without his input. ¶ 26. At 11:38 AM, Edmond sends a notice to Plaintiff that he was being terminated. ¶ 27.

## ii.   Interference theory

The TAC contains a generalized allegation that SEIU "violated the FMLA by interfering with Raleigh's FMLA leave." ¶ 57. To establish a prima facie case of FMLA interference, a Plaintiff must show that:

> (1) he was an eligible employee;
> (2) the defendant was an employer as defined under the FMLA;
> (3) the employee was entitled to leave under the FMLA;
> (4) the employee gave the employer notice of his intention to take leave; and
> (5) the employer denied the employee FMLA benefits to which he was entitled.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir.2005)).

In his Response, Plaintiff describes in greater detail what he sees as interference: the fact that SEIU staff called him and emailed him while he said he was on leave to speak to him about the ongoing investigation. ECF No. 43, PageID.882-83. He contends that he was unresponsive and did not participate in the investigation in any capacity or communicate with SEIU management after October 23, 2017 due to the suggestion of both his doctor and therapist, because it was not

9

healthy and would contribute to his stress and anxiety. Raleigh Dep. 143:20-144:1, ECF No. 44-3, PageID.1207.

However, "there is no right in the FMLA to be 'left alone,'" and be completely absolved of responding to an employer's discrete inquiries. *Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3d Cir. 2005) (holding that employer's requiring employees on FMLA leave to notify the employer when leaving and returning home does not interfere with FMLA); *see also Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009) (holding that occasional phone calls inquiring about files do not qualify as "interference" with FMLA leave); *Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886, 910-11 (E.D. Mich. 2007) (same). The Sixth Circuit has indicated that "under certain circumstances, multiple phone calls from an employer and demands to complete more than simple tasks could rise to the level such that an employee's FMLA leave becomes unjustifiably disrupted," but that discrete inquiries that amount to "de minimis contact" are not actionable. *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 654 F. App'x 675, 680 (6th Cir. 2016) ("numerous" attempts to contact hospital employee to learn the location of his pager while he was on leave found not to interfere with his FMLA rights).

On the record before the Court, no reasonable jury could find the few phone and email attempts to contact Raleigh anything more than de minimis; there are no facts that would allow an inference that such

10

contacts were disruptive, so Plaintiff has failed to raise a genuine issue of material fact that they constituted interference with his FMLA rights.

### iii.  Retaliation theory

Plaintiff next alleges that he was retaliated against because the SEIU fired him while he was on FMLA leave. ECF No. 43, PageID.883. To establish a prima facie case of FMLA retaliation, the Plaintiff must show that:

> (1) he was engaged in an activity protected by the FMLA;
> (2) the employer knew that he was exercising his rights under the FMLA;
> (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and
> (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian*, 454 F.3d at 556 (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir.2003)).

The *McDonnell-Douglas* burden shifting framework applies in the retaliation context. *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Once a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason" for his departure, after which the plaintiff has the "burden of showing that the articulated reason is in reality a pretext to mask discrimination." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

Though Defendant has previously contested whether Raleigh even properly took FMLA leave under element (2), at this stage Defendant's argument is that Raleigh cannot show under the *McDonnell-Douglas* framework that SEIU's stated reason for firing him—nepotism and complaints of abusive behavior from employees he supervised—was pretextual. ECF No. 40, PageID.455. In response, Raleigh cites evidence that SEIU leadership had always known about the fact that Scott Courtney's relative was employed by the union, that Raleigh was not the relative's supervisor, that the decision to move the relative to his payroll in Detroit was something that SEIU executives were aware of and even requested, and finally, that there are reasons to doubt the accounts of employees who filed complaints about him. ECF No. 43, PageID.888-891.

Raleigh sets out sufficient facts to establish a prima facie case of FMLA retaliation: although the investigation that led to Raleigh's placement on administrative leave began before he took FMLA leave, his termination took place while he was on leave. The timing of these events—he was fired approximately ten days after requesting leave—is sufficient for a prima facie case of causality. *Skrjanc*, 272 F.3d at 317. As noted, the SEIU articulates at least two legitimate, non-discriminatory reasons why Raleigh was terminated. The burden then shifts back to Raleigh to indicate that these reasons are in fact a pretext for discrimination under the FMLA.

If there are issues of material fact raised about the reason that an employee was fired, such that there is a possibility the employee was fired for engaging in protected activity under the FMLA, summary judgment should not be granted because that question is for a jury to resolve. *See, e.g., Arban*, 345 F.3d at 403 (in upholding jury's finding of a retaliatory discharge claim, Sixth Circuit observed that the record "contains evidence that supports the jury's finding that West's explanation for Arban's termination was disingenuous and that the real reason was the taking of FMLA leave"). Mr. Raleigh and Mr. Kendall Fells, a colleague who was terminated around the same time as Raleigh, both provide testimony raising questions about pretext—whether nepotism and treatment of employees were the real reasons Mr. Raleigh was terminated. But the problem is that Raleigh has not put forward any evidence that would convince a reasonable jury that this pretext was a "mask for discrimination," and that the *real* reason for his firing—or at least part of the reason—was his FMLA leave.

Raleigh cites to two pieces of evidence that he says indicate his termination was motivated by his decision to take leave. First, he points to a statement in the testimony of SEIU Executive Vice President Leslie Frane in which she says "that issue" was a "major contributor" to his termination. Frane Dep. 154:18-155:11, ECF No. 51. But when read in context, it is clear "that issue" to which Frane referred was the fact that Raleigh "had authorized payment for an employee with no evidence that

13

the employee was doing work." *Id*. at 155:3-11. Second, he claims that SEIU National Organizing Director Barbara Rosenthal's testimony that she was "frustrated" he did not pick up the phone or respond to emails is an indicator of discrimination. But the inferential leap between merely being "frustrated" at non-responsiveness and firing someone for taking FMLA leave is too large, and Rosenthal states immediately afterwards in her testimony that Raleigh was not terminated because of his failure to be responsive. Rosenthal Dep. 164:2-13, ECF No. 45-4, PageID.1706. Neither of the scenarios relied on by Raleigh create a genuine issue of material fact as to whether his firing was a pretext for discrimination under the FMLA.[3]

In his briefing, Raleigh notes that discrimination does not have to be the sole reason for termination to find an FMLA violation, and that he "still succeeds on his FMLA retaliation claim even if the Union had legitimate reasons to terminate him, provided that his leave status *at least played a role* in the Union's decision-making." ECF No. 43, PageID.885 (emphasis added). But he has not fulfilled this precondition—these facts to do not suggest that his leave status played

---

[3] Raleigh also indicates that the "suspicious timing" of his firing indicates that it was retaliatory, but timing alone, while sufficient to make out a prima facie case, is not enough to show pretext. *Skrjanc*, 272 F.3d at 317 ("temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual").

any role in his termination. Because he cannot establish a genuine issue of material fact as to whether his termination was motivated by discrimination, Raleigh cannot make out a retaliation claim.

### iv.    Conclusion

Plaintiff Raleigh cannot show an FMLA violation under either the interference or the retaliation theories, and therefore Defendant's motion as to Count I of the TAC will be granted.

## B. Tort claims

Raleigh also alleges that the way the SEIU communicated internally and externally during this time period led to a false perception that he was being accused of sexual harassment, and that therefore SEIU is liable to him for defamation, defamation by implication, group libel, false light invasion of privacy, and public disclosure of private facts. Each of these causes of action will be discussed in turn.

### i.    Defamation

In Michigan, defamation requires showing: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Sarkar v. Doe*, 897 N.W.2d 207, 220 (Mich. App. 2016) (internal citations omitted).

A statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010) (internal citations omitted). A threshold question is what statements Plaintiff alleges to be "false" and "defamatory" that may serve as the basis for his defamation claim. He cites a number of communications by the SEIU that either do not contain materially false information or that require inferences that are beyond reasonable to create a genuine issue of material fact that a defamatory statement was actually made. ECF No. 43, PageID.899-904.[4]

However, the conference calls hosted on October 23, as described through Kendall Fells' testimony, are another matter. Fells describes being present for two internal conference calls with SEIU staff where he testifies that he "understood [Union executives] to be saying that there were sexual misconduct allegations, and that under those allegations, Scott had resigned and that Mark had been put on administrative leave, pending the investigation. It was pretty clear that's what they said." Fells Dep. 35:10-14, ECF No. 43-3. In his testimony, Fells repeatedly asserts his recollection that this kind of statement was made during the call. Fells Dep. 31:15-20; 32:25-33:8; 33:24-34:2; 34:12-18; 34:20-25; s*ee also*

---

[4] These include: an October 23 email from SEIU President Henry, a press release issued on that day by Communications Director Sahar Wali, and "off-the-record" statements Raleigh alleges were made to media about both Fells' and Raleigh's termination.

Fells Decl. ¶ 21, ECF No. 43-4, PageID.974 ("During those calls, Union leadership, including President Henry, said there were allegations of sexual misconduct, Courtney had resigned, and Mark Raleigh was put on suspension, pending an investigation.").

This testimony raises a genuine issue of material fact as to whether SEIU leadership stated on one or both of these calls that Mark Raleigh was being investigated for sexual misconduct, when they knew that to be untrue. Such a statement would be an unprivileged communication to third parties, and would also constitute defamation per se, such that the elements of a defamation claim would be met. *See Sias v. Gen. Motors Corp.*, 127 N.W.2d 357, 360 (Mich. 1964) (finding that explanation of "circumstances of separation" to co-workers who were not supervisors or company officials is not a privileged communication); *Glazer v. Lamkin*, 506 N.W.2d 570, 573 (Mich. App. 1993) (defamation per se exists where the words spoken are false, made with the knowledge that they are false and therefore malicious, and "injurious to a person in that person's profession or employment") (citing *Swenson-Davis v. Martel*, 354 N.W.2d 288 (Mich. App. 1984)).

Defendant does not dispute that these calls took place but argues that Fells' description of the phone calls is too general to create a genuine issue of material fact as to whether any false or defamatory statement was uttered. While Defendant is correct that Fells is unable to quote verbatim the statements that were made or exactly who made them, they

17

are specific enough to raise a question of fact so that a jury will need to decide what exactly the Union executives said and whether it was actionable. Moreover, Defendants do not point to any cases that persuade the Court that testimony such as Mr. Fells' is insufficient to raise a genuine issue of material fact as to whether a defamatory statement as made.[5] *Any* recollection of a statement after it was made is likely to involve some amount of paraphrasing or generality. Fells' testimony creates a genuine issue of material fact for the Court; whether it is found sufficient to eventually lead to liability is a question of credibility properly left for the jury. Defendant's motion as to Count II's claim of defamation is denied.

### ii.   Defamation by implication

"Michigan recognizes defamation by implication without a direct showing of a false statement," so long as "the defamatory implications are materially false." *Panian v. Lambrecht Assocs.*, 14-cv-572, 2014 U.S. Dist. LEXIS 167189, at *5 (W.D. Mich. Dec. 3, 2014) (citing *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 132 (Mich. 1991)); *Am.*

---

[5] Both of the cases cited by Defendant have more extreme facts in terms of the extent to which the alleged defamatory statement was paraphrased, and also rest their findings of dismissal on alternative grounds. *See Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 207 (E.D.N.Y. 2013); *Dailey v. Accubuilt, Inc.*, 944 F. Supp. 2d 571, 585 (N.D. Ohio 2013).

*Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 609 N.W.2d 607, 611 (Mich. Ct. App. 2000).

If there is a genuine issue of material fact as to the existence of a defamatory statement, but the other elements of the defamation claim are met, it follows that a defamation by implication claim can also still stand. Even if a jury were to find that there was no specific statement made by Defendant that was defamatory, it could find that the statements described by Fells created the "defamatory implication" that Mr. Raleigh was being investigated for sexual harassment. The motion as to this claim is also denied.

### iii.   Group libel

While Plaintiff brings up a group libel theory in his Response (ECF No. 43, PageID.901), this claim is nowhere alleged in the TAC, perhaps because in its last Order the Court denied Plaintiff's request for leave to include a group libel theory in an amended complaint. ECF No. 18, PageID.225. For the reasons given in the Court's previous Order, this claim cannot be brought at this stage and the Defendant's motion as any group libel claim under Count II is granted.

### iv.   False light invasion of privacy

To show false light, a plaintiff must show that the defendant "broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were

false and placed the plaintiff in a false position." *Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 448 (Mich. App. 2018) (quoting *Duran v. Detroit News, Inc.*, 504 N.W.2d 715 (Mich. App. 1993)). The plaintiff must also show either knowledge or recklessness regarding the falsity of the statements and the false light in which the plaintiff would be placed. In light of Fells' deposition testimony regarding the SEIU calls with employees, the analysis regarding false light invasion of privacy tracks that which applied to the defamation claim: Plaintiff has raised a genuine issue of material fact that union officials broadcast information to SEIU employees that they knew to be false, and that would place him in a false light. Whether Plaintiff can prove this is a question for the jury. Summary judgment as to this claim is denied.

### v.   Public disclosure of private facts

"Public disclosure of private facts" is another kind of invasion of privacy claim. Plaintiff must show "(1) the disclosure of information (2) that is highly offensive to a reasonable person and (3) that is of no legitimate concern to the public." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 919 (Mich. App. 2014) (quoting *Doe v. Mills*, 536 N.W.2d 824 (Mich. App. 1995)). The information disclosed must be of a private nature, meaning it cannot already be in public record or otherwise accessible to the public. *Doe v. Peterson*, 784 F. Supp. 2d 831, 841 (E.D. Mich. 2011) (quoting *Duran*, 504 N.W.2d at 715).

20

Raleigh argues that the reason for his firing was a matter of private concern, and that same internal phone calls serve as the basis for this claim. But the Court has previously determined that the reason for his termination was in fact a matter of public concern, and none of the evidence that Raleigh has put forward in the interim changes this conclusion. *See* ECF No. 18, PageID.222-24. He therefore cannot meet element (3) of this claim. Defendant's motion for summary judgment as to the claim for public disclosure of private facts must be granted.

## CONCLUSION

For all the reasons set out above, Defendant's Motion for Summary Judgment (ECF Nos. 40, 41) is **GRANTED IN PART** and **DENIED IN PART.** Specifically, Count I (FMLA liability) and Count II as to group libel and public disclosure of private facts are **DISMISSED WITH PREJUDICE**. Defendant's motion as to Count II's claims of defamation, defamation by implication, and false light invasion of privacy is **DENIED**.

**SO ORDERED**, this 29th day of September, 2021.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

21